# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KEVIN WALSH and AAA BAILMASTER BAIL BONDS, LLC,, | |
| Plaintiffs, | CIVIL ACTION NO. 3:22-cv-00513 |
| v. | (SAPORITO, C.M.J.) |
| DEIRDRE CURRAN, JOSEPHINE CASTELLANO, ABSOLUTE BONDS, LLC and ABA BAIL BONDS, LLC, | |
| Defendants. | |

## MEMORANDUM

This is a contract dispute among professional bail bondsmen. We may properly exercise jurisdiction over the dispute as it involves citizens of different states and an amount in controversy exceeding $75,000. *See* 28 U.S.C. § 1332.

## I. BACKGROUND

The plaintiffs in this action are: (a) Kevin Walsh, a resident of New Jersey, and (b) AAA Bailmaster Bail Bonds, LLC ("Bailmaster"), a New Jersey limited liability company, of which Walsh is the sole owner and principal. The defendants are (a) Deirdre Curran, a resident of Florida, (b) Absolute Bail Bonds, LLC ("Absolute"), a Pennsylvania limited

liability company, of which Curran is the sole owner and principal; (c) Josephine Castellano, a resident of Florida, and (d) A B A Bail Bonds, LLC ("ABA"), a Pennsylvania limited liability company, of which Castellano is the sole owner and principal.[1]

Beginning in 2015, the defendants had provided bail bond service to criminal defendants in seven northeastern Pennsylvania counties: Pike, Monroe, Wayne, Wyoming, Lackawanna, Carbon, and Luzerne Counties. In 2021, Curran and Castellano decided to move from Pennsylvania to Florida for personal reasons. They negotiated a sale of their bail bondsman businesses for $150,000 to Walsh, whom Curran and Castellano had known professionally for years.

On June 18, 2021, the parties entered into a "Contract for Sale of Advertisement" in which the defendants sold the assets of their bail bondsman businesses, including advertising assets, to the plaintiffs. The contract provided for the conveyance to Bailmaster of four phone numbers and other personal property located at the offices of Absolute and ABA in exchange for $150,000 paid in installments. The first

---

[1] At the time when the contract between the parties was executed, Curran and Castellano resided in Pennsylvania.

installment of $30,000 was due at closing, and the remaining $120,000 was to be paid in monthly installments of $10,000 beginning August 1, 2021. The contract also contained a restrictive covenant and an anti-solicitation clause. The restrictive covenant prohibited Curran or Castellano from engaging in the bail bondsman business in Pennsylvania for a period of three or five years from the closing date.[2] The anti-solicitation clause prohibited the defendants from soliciting employees, customers, clients, lessors, renters, vendors, or property owners who had done business with them prior to closing without the plaintiffs' consent. The contract was drafted by an attorney retained by the plaintiffs, Alexander J. Rinaldi, Esq.[3]

At the closing, the plaintiffs remitted payment of the initial $30,000 payment. Beginning August 1, 2021, and continuing for six months, Walsh remitted the $10,000 monthly installment payments to Curran and Castellano.

Notwithstanding the restrictive covenant, Castellano continued to

---

[2] The parties have disputed whether the restrictive covenant was for three years or five years. Two versions of the same contract were offered into evidence at trial.

[3] The defendants were not represented by an attorney in connection with the agreement.

write bail in Pennsylvania from time to time after the closing with Walsh's consent, typically when Walsh was out of town for the weekend or otherwise unable to write bail himself. In September 2021, however, Walsh learned from Curran that Castellano had also been writing bail in Pennsylvania "behind his back" and as a sub-producer for one of his competitors, a Scranton-based bail bond agency, Cutting Edge Bail Bonds ("Cutting Edge").

On January 31, 2022, an attorney representing the plaintiffs, William H. Pandos, Esq., sent a cease-and-desist letter to the defendants, advising the defendants that, based on Castellano's writing of bail in Pennsylvania on multiple occasions without the plaintiffs' consent, the plaintiffs considered the defendants to be in material breach of the non-compete clause in the asset sale agreement that the parties had executed. As a consequence, Pandos advised, the plaintiffs would suspend further payment to the defendants under the contract until such time that this breach was cured and the plaintiffs were made whole for damages incurred as a result of the breach.

The plaintiffs ceased payment immediately. The last six monthly payments due under the contract have not been remitted to the

defendants.

On April 6, 2022, the plaintiffs filed their complaint in this action, asserting breach of contract claims against the defendants, and seeking damages and declaratory and injunctive relief. On April 21, 2022, the defendants filed their answer and affirmative defenses to the complaint, and they asserted counterclaims for breach of contract against the plaintiffs, seeking damages and injunctive relief. On April 26, 2022, the plaintiffs filed their answer and affirmative defenses to the defendants' counterclaims.

The parties engaged in a period of discovery. On May 15 and 16, 2023, the parties appeared before the undersigned United States magistrate judge for a bench trial.

## II.   DISCUSSION

Both sides claim that the other side materially breached the advertising asset sale agreement between them. For relief, the plaintiffs request declaratory judgment, and both sides seek compensatory damages and equitable relief in the form of an injunction or decree of specific performance. Both sides also seek an award of costs and attorney fees.

The plaintiffs contend that Castellano's posting of bail bonds without their consent—moreover, for a competitor—constitutes a material breach of the asset sale contract's five-year non-compete clause. The plaintiffs further contend that this material breach permitted them to suspend performance under the contract—i.e., suspend the monthly installment payments of $10,000 that remained due under the contract.

The defendants contend that, because Walsh consented to Castellano's writing bail in Pennsylvania from time to time when he was unavailable, the non-compete clause had been waived or the plaintiffs should be estopped from enforcing it. The defendants further contend that, to the extent Walsh and Bailmaster would not have written smaller bail amounts, those bails written by Castellano are not material.[4] Moreover, the defendants contend that the duration of the non-compete clause was three years, not five years. Finally, the defendants contend that it was the plaintiffs who materially breached the asset sale agreement in failing to make the final six monthly payments.

---

[4] Walsh testified that, as a matter of practice, he would not write bail for amounts less than $5,000. Some of the bails posted by Castellano were for $1,000. Most, however, were for $5,000 or more.

## A. Evidence Received Into the Record

### 1. *Testimony of Kevin Walsh*

The plaintiffs presented the testimony of Kevin Walsh, the owner and principal of AAA Bailmaster Bail Bonds, LLC. Walsh testified about his professional background in the bail business and the background of his company, Bailmaster. Walsh explained how the bail business worked, how he had come to know the defendants professionally, and how he came to write bail bonds in Pennsylvania after bail reform had been adopted in New Jersey. He testified about the negotiation of the advertising asset sale agreement between himself and the defendants. He identified and authenticated the contract executed by the parties on June 18, 2021, and he testified that it had been drafted by Attorney Rinaldi based on terms negotiated directly between Walsh, Curran, and Castellano.

Walsh testified about the events leading to his suspension of monthly payments under the contract in February 2022. He acknowledged that he had given Castellano permission to write bail bonds *for* his company at times when he was unable to do so due to travel or other reasons, but he testified that he had never consented to her working *against* him, writing bail bonds without his knowledge and in

competition with his company. Walsh testified that he first learned that Castellano was writing bail bonds without his knowledge or consent from Curran in September 2021.[5] Walsh testified about his efforts to investigate, first by carefully worded inquiries to Castellano by text message, and later by pulling bail management reports from local state courts after he learned such reports were available.

Walsh testified regarding damages, reviewing the bail management reports and walking through his calculation of the premium amounts Castellano collected on those bail bonds.[6] Based on the bail management reports, he testified that Castellano had written $1,134,000 in bail bonds without his authorization. After deducting surety and BUF account expenses, he testified that she had earned $90,720 in income on bail bonds that would otherwise have been written by his company, Bailmaster. Walsh also testified about attorney fees and litigation costs

---

[5] Curran apparently reached out to Walsh after she and Castellano had a personal dispute.

[6] Walsh testified that the premium collected by the bail bondsman was 10% of the face amount of the bail bond. From that premium, 1% of the bond's face value would be paid to the bail bondsman's surety company and 1% of the bond's face value would be deposited into a "BUF" account—a reserve account from which any forfeitures of bail bonds written by the bail bondsman would be paid. The remainder of the premium was the fee earned by the bail bondsman.

he had incurred as a result of this lawsuit.

On cross-examination, Walsh acknowledged that, although he had experienced some trouble and confusion regarding transfer of the phone numbers identified in the contract, ultimately three of the four numbers were transferred to him, and the fourth—Curran's personal cell number—was disconnected. Using an exhibit, defense counsel walked Walsh through several text messages exchanges between himself and the defendants, identifying several time periods in which Walsh had indicated to Castellano that he would be out of town or otherwise unable to write bail bonds, many of which appeared to overlap with the dates of bail bonds identified by Walsh as having been written by Castellano without his authorization. Walsh also acknowledged that some of the bail bonds included on his list were for amounts below the $5,000 minimum face value for which he would write bail bonds.

Walsh was called as a rebuttal witness as well. On rebuttal, he expressly denied that the asset sale agreement had ever included a three-year non-compete clause.

Based on the demeanor of the witness and the consistency of his testimony with the record as a whole, we find Walsh's testimony to be less

than fully credible.

### 2. Testimony of Dierdre Curran

The defendants presented the testimony of Dierdre Curran, the owner and principal of Absolute Bail Bonds, LLC. Curran testified about her professional background in the bail business and the background of her company, Absolute. Curran explained how she had come to know Walsh professionally and how she had come to write bail bonds in Pennsylvania after bail reform had been adopted in New Jersey.

Curran testified about the negotiation of the advertising asset sale agreement between the parties. In particular, she testified that she had objected to the five-year non-compete period proposed by Walsh and countered with a three-year non-compete period, which Walsh had accepted. Curran identified and authenticated a partial copy of what she said was the asset sale agreement the parties had ultimately executed. She testified that they had edited the original contract drafted by Attorney Rinaldi on the computer to shorten the non-compete period to three years. This contract fragment included the same non-compete restrictive covenant as when drafted by Rinaldi, but only for a three-year period.

Curran testified about transitioning the bail agency business to Walsh after closing. In particular, she discussed troubles Walsh had experienced with the telephone systems and her efforts to help. She also testified about the arrangements that had been made for Castellano to write bail bonds for Walsh when he was unavailable.[7]

On cross-examination, Curran acknowledged that the pages following the non-compete clause were missing from the contract fragment about which she had testified. This includes the signature page of the purported contract with a three-year non-compete clause. In addition, she acknowledged that this contract fragment was not produced in discover, but for the first time at trial, despite requests for its production by the plaintiffs.

Curran also addressed her own calculation of damages, testifying that she had concluded that the defendants had suffered damages in the

---

[7] Curran also testified about "fugitive recovery work" she did on behalf of Walsh and Bailmaster during the transition period, for which she was never paid. The defendants' proposed findings of fact and conclusions of law include a claim for damages in connection with this work. But the defendants' did not assert any such claim in their counterclaim. This ancillary dispute is not properly before this court.

amount of $614,000 as a result of the plaintiffs' breach of contract.[8]

Curran testified that she had not told Walsh that Castellano was writing bail bonds behind his back, but that Walsh had been the one to bring that up.

Based on the demeanor of the witness and the consistency of her testimony with the record as a whole, we find Curran's testimony to be not credible.

### 3. Testimony of Josephine Castellano

The defendants presented the testimony of Josephine Castellano, principal of A B A Bail Bonds, LLC. Castellano testified about her professional background in the bail business, including her work as a sub-producer for Absolute and Cutting Edge, and the background of her company, ABA, which she formed in December 2020. Castellano testified about her conversations with Walsh prior to closing about her ongoing work writing bail bonds for Cutting Edge. She testified that she told

---

[8] Curran acknowledged on the stand that she had not produced a written calculation of damages, but she testified that she based this number on the $30,000 monthly income Walsh had indicated in his deposition testimony that he had earned writing bail bonds in Pennsylvania, multiplied by 14 months, plus the remaining $60,000 due under the asset sale agreement, plus $14,000 he owed her for fugitive recovery work.

Walsh that she was still writing bail for Cutting Edge, and that he said that it was not a problem. She further testified that Walsh told her that any time she was in Pennsylvania, she should continue writing bail bonds as usual. Castellano testified about the transition in the several months following the closing, during which time she interacted with Walsh by phone and text almost daily.

Castellano testified that she continued to write bail bonds in Pennsylvania after the closing. She testified that she disclosed these bail bonds to Walsh on multiple occasions, and even offered the bail bond opportunities to Walsh five or six times. She testified about particular circumstances in which Walsh was aware of these opportunities and approved of her writing the bail bonds. With her counsel, Castellano walked through some of the text messages she and Walsh had exchanged when he was out of town or otherwise unable to write bail bonds.

On cross-examination, Castellano acknowledged that she continued to write bail bonds in Pennsylvania on behalf of Cutting Edge after the June 18, 2021, closing, but she maintained that this did not constitute competition with Walsh and Bailmaster.

Castellano acknowledged that the asset sale agreement she signed

included a restrictive covenant, but she maintained that it was for a three-year non-compete period.

Based on the demeanor of the witness and the consistency of her testimony with the record as a whole, we find Castellano's testimony to be not credible.

### 4. Testimony of Anthony Rinaldi, Esq.

The plaintiffs presented the rebuttal testimony of Anthony Rinaldi, Esq., an attorney retained by Walsh and Bailmaster to prepare a sale agreement between the parties. Rinaldi testified that he prepared the asset sale agreement, and that the executed version submitted into evidence by the plaintiffs was the document he had drafted. He expressly denied that he had drafted the version submitted by the defendants. He further denied having engaged in any conversation or email exchange with the defendants. Based on the demeanor of the witness and the consistency of his testimony with the record as a whole, we find Rinaldi's testimony to be fully credible.

**B. Exhibits Received Into Evidence[9]**

1.     Exhibit J-1: Joint stipulation of facts.

2.     Exhibit P-1: Contract for Sale of Advertisement dated June 18, 2021.

3.     Exhibit P-2: AAA Bailmaster Bail Bonds, LLC Certificate of Formation.

4.     Exhibit P-3: Kevin Walsh's Commonwealth of Pennsylvania Bail/Insurance License.

5.     Exhibit P-4: AAA Bailmaster Bail Bonds, LLC Pennsylvania Bail/Insurance License.

---

[9] Objections for two of the plaintiffs' exhibits remained outstanding at the conclusion of the trial: Exhibit P-20 (Letter from Kathleen M. Ledbetter, Sr. Vice President, Regulatory Affairs of Financial Casualty & Surety, Inc., dated October 26, 2022) and Exhibit P-24 (Proof of Payments Made to Build-Up Fund Accounts by Financial Casualty & Surety, Inc. to Absolute Bail Bonds, LLC and to Josephine Castellano.). The defendants objected to admission of both documents on hearsay grounds. The plaintiffs responded that both documents were obtained from a non-party surety company in response to a subpoena duces tecum, arguing that they fell within the scope of the business records exception to the hearsay rule, Fed. R. Evid. 803(6). But without foundational testimony by the custodian of records or another qualified witness, or an appropriate certification to authenticate the documents, these exhibits are simply not admissible. *See* Fed. R. Evid. 803(6); Fed. R. Evid. 902(11); *United States v. Pelullo*, 964 F.2d 193, 200–02 (3d Cir. 1992). The defendants' hearsay objections with respect to Exhibits P-20 and P-24 are **SUSTAINED**. We have disregarded these exhibits.

6.    Exhibit P-5: Proof of $30,000.00 payment at closing.

7.    Exhibit P-6: Proof of monthly installment payments.

8.    Exhibit P-7: Sheet with advertising phone numbers.

9.    Exhibit P-12: January 31, 2022 letter from William H. Pandos, Esq., addressed to Josephine Castellano and Deirdre Curran.

10.    Exhibit P-14: Itemization of legal fees paid to WWGR law.

11.    Exhibit P-17: Itemization of filing and service fees.

12.    Exhibit P-18: Itemization of deposition costs.

13.    Exhibit P-19: Subpoena to Financial Casualty & Surety Inc.

14.    Exhibit P-21: Sub-Producer Bail Bond Agreement between Financial Casualty & Surety, Inc., Steven W. Krauss, Cutting Edge Bail Bonds, LLC, Josephine Castellano and Absolute Bail Bonds, LLC dated September 13, 2017.

15.    Exhibit P-22: Addendum Number 1 to the Sub-Producer Bail Bond Agreement between Financial Casualty & Surety, Inc., Steven W. Krauss, Cutting Edge Bail Bonds, LLC, Josephine Castellano and Absolute Bail Bonds, LLC dated May 3, 2019.

16.    Exhibit P-23: Sub-Producer Bail Bond Agreement between Financial Casualty & Surety, Inc., Steven W. Krauss, Cutting Edge Bail

Bonds, LLC, and Josephine Castellano, dated November 1, 2020.

17.    Exhibit P-25A: Text messages between Walsh and Curran.

18.    Exhibit P-25B: Text messages between Walsh and Curran.

19.    Exhibit P-25C: Text messages between Walsh and Curran.

20.    Exhibit P-25D: Text messages between Walsh and Curran.

21.    Exhibit P-25E: Text messages between Walsh and Castellano.

22.    Exhibit P-26: List of 43 bails done by defendants.

23.    Exhibit P-27: Plaintiffs' damages calculation.

24.    Exhibit P-28: Text message between Walsh, Curran, and Castellano, excerpted from Exhibit D-4.

25.    Exhibit P-29: Text message between Walsh and Curran, excerpted from Exhibit D-4.

26.    Exhibit P-30: Text messages between Walsh and Curran, excerpted from Exhibit D-4.

27.    Exhibit P-31: Text messages between Walsh and Curran, excerpted from Exhibit D-4.

28.    Exhibit P-32: Text messages between Walsh and Curran, excerpted from Exhibit D-4.

29.    Exhibit P-33: Text message between Walsh and Curran,

excerpted from Exhibit D-4.

30.    Exhibit P-34: Text messages between Walsh and Curran, excerpted from Exhibit D-5.

31.    Exhibit P-35: Revised and hand-annotated list of 32 bails done by defendants, derived from Exhibit P-26.

32.    Exhibit P-36: Hand-annotated list of bails referred between Walsh and Castellano, prepared by Walsh.

33.    Exhibit P-37: Hand-written lists of bails referred between Walsh and Castellano, prepared by Castellano.

34.    Exhibit D-1: Fragment of contract between the parties.

35.    Exhibit D-2: Email from Dierdre Curran to Kevin Walsh dated 6/1/21.

36.    Exhibit D-3: Text exchanges between parties produced by defendants.

37.    Exhibit D-4: Text message exchanges between parties produced by plaintiffs.

## C. Analysis

The parties do not dispute that they entered into an advertising asset sale agreement on June 18, 2021. For the most part, the key terms

of that agreement are not in dispute. They do not dispute that the plaintiffs agreed to purchase the advertising assets and other personal property of the defendants' bail bondsman businesses for $150,000 in total, with $30,000 paid at closing and $10,000 paid in monthly installments over the course of 12 months. They do not dispute that the contract included a restrictive covenant that prohibited the defendants from engaging in the bail bondsman business in Pennsylvania for a period of years after the closing date. They do not dispute that the plaintiffs made the initial $30,000 payment at closing and the first six $10,000 monthly installment payments.

The parties, however, dispute which version of the contract itself represents their actual agreement—in particular, they dispute whether the restrictive covenant contains a three- or five-year non-compete period. They dispute whether Castellano's continued writing of bail bonds after closing of the sale constituted a material breach of the agreement, or whether the plaintiffs waived the non-complete provision by permitting her to write bail bonds on behalf of the plaintiffs from time to time. And they dispute whether the plaintiffs were privileged to suspend performance of the monthly payment terms of the agreement because of

the defendants' material breach, or if the plaintiffs' failure to make these monthly payments was itself a material breach of the agreement.

Based on the testimony and evidence presented at trial, we find that the version of the contract proffered by the plaintiffs, Exhibit P-1, which contains a *five-year* non-compete provision, is the actual contract entered into by the parties on June 18, 2021. We note that this exhibit is more complete than the version proffered by the defendants, Exhibit D-1, and it is better supported by the testimony and other evidence of record. In addition, we note that the plaintiff's complaint expressly alleged that the contract contained a *five-year* non-compete period, and the defendants' answer contained an unqualified *admission* of this allegation. *See* Compl. ¶ 13, Doc. 1; Answer ¶ 13, Doc. 4.

The defendants contend that the plaintiffs' failure to strictly enforce the non-compete restriction against Castellano should be deemed a waiver of their rights under this provision of the contract. Lax enforcement of a restrictive covenant may be held to be a waiver of that provision. *See, e.g.*, *Surgidev Corp. v. Eye Tech., Inc.*, 648 F. Supp. 661, 698 (D. Minn. 1986) ("Under the circumstances, it would be inequitable to permit plaintiff to now rely on a non-compete agreement which it has

so blithely ignored in the past."). But this is not such a circumstance in which the plaintiffs "blithely ignored" the provision. *See, e.g.*, *Midwest Television, Inc. v. Oloffson*, 699 N.E.2d 230, 236 (Ill. App. Ct. 1998) (distinguishing *Surgidev* where evidence that employer had not enforced non-compete in some circumstances did not support a finding that the employer had "blithely ignored" the provision). The plaintiffs selectively invited Castellano to write bail bonds on occasions when Walsh was unable to do so himself due to travel or other unavailability. These instances were in support of the plaintiffs' bail business, not in competition with it. Based on the testimony and evidence presented at trial, it is clear that, in addition to these authorized instances, Castellano undertook on multiple occasions to write bail bonds in Pennsylvania in competition with the plaintiffs and without the plaintiffs' knowledge or consent. Under the circumstances presented, we find no wavier of the restrictive covenant.

We further find that this unauthorized, competitive bail writing by Castellano constituted a material breach of the advertising sale agreement. It is a "settled principle of contract law" that "a material breach by one party to a contract entitles the non-breaching party to

suspend performance." *Widmer Eng'g, Inc. v. Dufalla*, 837 A.2d 459, 467 (Pa. Super. Ct. 2003). Thus, the plaintiffs' suspension of monthly payments in response to the defendants' material breach was privileged and not itself a breach of contract.

In an effort to quantify damages, the plaintiffs submitted evidence derived from public records documenting the total amount of bail bonds written by Castellano after the sale closing date. But they have been unable to clearly differentiate between particular bail bonds written by Castellano *with* authorization and those written *without* authorization. Moreover, any determination of damages arising from the defendants' competitive behavior in the remaining future years of the non-compete period would be inherently speculative. Thus, we find that an award of damages in favor of the plaintiff would be inadequate. *See Clark v. Pa. State Police*, 436 A.2d 1383, 1385 (Pa. 1981) ("An action for damages is an inadequate remedy when there is no method by which the amount of damages can be accurately computed or ascertained.").

In the alternative, the plaintiffs have requested an injunctive order in the nature of a decree of specific performance. "[S]pecific performance is an equitable remedy for breach of contract permitting the court to

compel performance of a contract when there exists in the contract an agreement between the parties as to the nature of the performance." *TruePosition, Inc. v. LM Ericsson Tel. Co.*, 977 F. Supp. 2d 462, 472 (E.D. Pa. 2013); *see also Geisinger Clinic v. Di Cuccio*, 606 A.3d 509, 521 (Pa. Super. Ct. 1992). "A decree of specific performance is a matter of grace and not right. Specific performance should only be granted where the facts clearly establish the plaintiff's right thereto, where no adequate remedy at law exists, and where justice requires it." *Clark*, 436 A.2d at 1385 (citation omitted); *see also Castle v. Cohen*, 840 F.2d 173, 178 (3d Cir. 1988) ("If there is no adequate remedy at law, a court of equity may, in its discretion, grant specific performance."); *Lackner v. Glosser*, 892 A.2d 21, 31 (Pa. Super. Ct. 2006) (quoting *Clark*, 436 A.2d at 1385).

We find the remedy of specific performance appropriate under the circumstances presented in this case. Thus, we will enter an order or decree of specific performance directing the defendants to comply with the terms of the restrictive covenant set forth at paragraph 16(a) of the advertising sale agreement, the substance of which provides that the defendants shall not reestablish, reopen, become engaged, employed or in any other manner whatsoever be interested, directly or indirectly, in

the same or similar business as that sold to the plaintiffs within the state of Pennsylvania for a period of five years from the date of closing, June 18, 2021.

The plaintiffs' suspension of performance with respect to their remaining monthly payment obligations poses a wrinkle, as an obligation of $60,000 due to the defendants remains unpaid by the non-breaching plaintiffs. The Restatement of Contracts provides that "[a]n order of specific performance or an injunction will be so drawn as best to effectuate the purposes for which the contract was made and on such terms as justice requires. It need not be absolute in form and the performance that it requires need not be identical with that due under the contract." Restatement (Second) of Contracts § 358(1) (Am. L. Inst. 1981).

> The objective of the court in granting equitable relief is to do complete justice to the extent that this is feasible. . . . The form and terms of the order are to a considerable extent within the discretion of the court. Its order may be directed at the injured party as well as at the party in breach. It may be conditional on some performance to be rendered by the injured party . . . .

*Id.* § 358 cmt. a; *see also Castle*, 840 F.2d at 178 ("While a court at law usually issues unconditional judgment, a court of equity may, in its

discretion, condition its decree on some performance by the plaintiff. The decree will protect the defendant's substantial rights by making any order for his performance conditional on concurrent action by the plaintiff.") (ellipsis and internal quotation marks omitted); *United States v. Bedford Assocs.*, 618 F.2d 904, 919 (2d Cir. 1980) ("[T]o ensure that a decree of specific performance will not work an injustice on the defendant, the court may well make its decree conditional on certain actions by the claimant . . . Sometimes it may be necessary to require money payment by the plaintiff and to make the decree conditional on such payment."). Thus, we will condition our order or decree of specific performance upon the plaintiffs' payment to the defendants of the remaining $60,000 balance of monthly installment payments owed to the defendants under the advertising asset sale agreement.

The plaintiffs have included a demand for an award of attorney fees as part of their requested relief. "Under Pennsylvania law, 'there can be no recovery of attorneys' fees from an adverse party, absent an express statutory authorization, a clear agreement by the parties or some other established exception.'" *Dehart v. HomEq Servicing Corp.*, 679 Fed. App'x 184, 190 (3d Cir. 2017) (quoting *Merlino v. Delaware Cnty.*, 728 A.2d 949,

951 (Pa. 1999)). The plaintiff has identified no such basis for recovery of attorney fees, merely suggesting without authority that they should be recoverable as a component of compensatory damages.[10] Thus, the plaintiffs' request for an award of attorney fees will be denied.[11]

## III.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

For the foregoing reasons, we make the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. In accordance with these findings of fact and conclusions of law, the clerk will be directed to enter judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.

### A. Findings of Fact

1.      Plaintiff Kevin Walsh is domiciled in New Jersey.

2.      Walsh is the sole owner and principal of plaintiff AAA Bailmaster Bail Bonds, LLC ("Bailmaster").

---

[10] We note that the advertising asset sale agreement does contain indemnification provision, which the plaintiffs cite in arguing that they are entitled to an award of attorney fees. But the indemnification provision in favor of the plaintiffs applies only to liabilities or expenses arising out of operation or ownership of the business *prior to* the closing date, June 18, 2021.

[11] As the prevailing party, the plaintiffs may be entitled to taxation of costs—other than attorney fees—under 28 U.S.C. § 1920 and Fed. R. Civ. P. 54(d)(1).

3.    Defendant Dierdre Curran is domiciled in Florida.

4.    Curran is the sole owner and principal of defendant Absolute Bail Bonds, LLC ("Absolute").

5.    Defendant Josephine Castellano is domiciled in Florida.

6.    Castellano is the sole owner and principal of defendant A B A Bail Bonds, LLC ("ABA").

7.    On June 18, 2021, the parties executed a "Contract for Sale of Advertisement" (the "Contract").

8.    A true and correct copy of the Contract was submitted into evidence as Trial Exhibit P-1.

9.    The Contract provided that the plaintiffs, Walsh and Bailmaster (the "Buyers"), pay $150,000 in total to the defendants, Curran, Castellano, Absolute, and ABA (collectively, the "Sellers"), in consideration for conveyance of certain advertising assets and other personal property of the defendants' bail bondsman businesses.

10.    The Contract provided that this consideration would be paid in installments, as follows: (a) $30,000 due upon closing; and (b) monthly installment payments of $10,000 each month for twelve months beginning August 1, 2021.

11.   The Contract included a restrictive covenant, set forth at paragraph 16(a), which stated as follows:

> Seller or any stockholder, director or officer of Seller, including but not limited to DEIRDRE CURRAN and JOSEPHINE CASTELLANO, both individually and as Shareholder of Seller, covenant and agree that they will not reestablish, reopen, become engaged, employed or in any other manner whatsoever be interested, directly or indirectly, in the same or similar business as being sold to the Buyer within the state of Pennsylvania for a period of five (5) years from the date of closing.

12.   The plaintiffs remitted payment of $30,000 to the defendants at closing on June 18, 2021.

13.   The plaintiffs timely remitted the first six monthly installment payments of $10,000 to the defendants on or about: August 1, 2021; September 1, 2021; October 1, 2021; November 1, 2021; December 1, 2021; and January 1, 2022.

14.   On January 31, 2022, an attorney representing the plaintiffs sent a cease-and-desist letter to notify the defendants that the plaintiffs had suspended further monthly payments due to an alleged breach of the Contract's restrictive covenant, *inter alia*.

15.   The plaintiffs have not remitted the final six monthly installment payments of $10,000 due to be paid on: February 1, 2022;

March 1, 2022; April 1, 2022; May 1, 2022; June 1, 2022; and July 1, 2022.

16.   The total balance of the monthly installment payments due from the plaintiffs to the defendants that have not been paid is $60,000.

17.   Notwithstanding the restrictive covenant, Castellano engaged in the business of writing bail bonds in Pennsylvania on multiple occasions after the closing date, June 18, 2021.

18.   Although the plaintiffs consented to some of this bail business activity by Castellano when done with the knowledge of and for the benefit of the plaintiffs, some of this bail business activity by Castellano was done without the plaintiffs' knowledge and consent.

19.   There is no method by which the amount of damages suffered by the plaintiffs as a result of the defendants' alleged breach can be accurately computed or ascertained.

20.   Based on the demeanor of the witness and considering the record as a whole, the testimony of Kevin Walsh is less than fully credible.

21.   Based on the demeanor of the witness and considering the record as a whole, the testimony of Dierdre Curran is not credible.

22.   Based on the demeanor of the witness and considering the record as a whole, the testimony of Josephine Castellano is not credible.

23.     Based on the demeanor of the witness and considering the record as a whole, the testimony of Anthony Rinaldi, Esq., is fully credible.

### B. Conclusions of Law

1.     Plaintiffs Walsh and Bailmaster  are citizens of New Jersey.

2.     Defendants Curran, Castellano, Absolute, and ABA are citizens of Florida.

3.     The amount in controversy in this case exceeds $75,000.

4.     The parties entered into a valid and binding Contract.

5.     The plaintiffs did not waive the restrictive covenant set forth at paragraph 16(a) of the Contract.

6.     The bail business activity by Castellano, undertaken after the closing date, June 18, 2021, and without the plaintiffs' knowledge or consent constituted a material breach of the restrictive covenant set forth at paragraph 16(a) of the Contract.

7.     The plaintiffs' suspension of monthly payments in response to the defendants' material breach was privileged and not itself a breach of contract.

8.     An award of damages in favor of the plaintiff would be

inadequate because there is no method by which the amount of damages can be accurately computed or ascertained.

9.    The remedy of specific performance is appropriate under the circumstances presented in this case.

10.    The court will enter a conditional order or decree of specific performance directing the defendants to comply with the terms of the restrictive covenant set forth at paragraph 16(a) of the Contract.

11.    To protect the substantive rights of the defendants, our order or decree of specific performance will be conditioned upon the plaintiffs' payment to the defendants of the remaining $60,000 balance of monthly installment payments due under the Contract.

## IV.    CONCLUSION

For the foregoing reasons, we will direct the clerk to enter judgment in favor of the plaintiffs and against the defendants on all counts of the plaintiffs' complaint and all counts of the defendants' counterclaim. We will enter a conditional order or decree of specific performance directing the defendants to comply with the five-year non-compete provision of the advertising asset sale agreement. Our order or decree of specific performance will be conditioned upon the plaintiffs' payment to the

defendants of the remaining $60,000 in payments due under the advertising asset sale agreement.

An appropriate order follows.

Dated: March 29, 2024                    *s/Joseph F. Saporito, Jr.*
JOSEPH F. SAPORITO, JR.
Chief United States Magistrate Judge